Clerk's Office
Filed Date:  8/24/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
THOMAS FIELDS,

                  Petitioner,

        -against-                    NOT FOR PUBLICATION
                                   **MEMORANDUM & ORDER**
THE STATE OF NEW YORK,       18-CV-2579 (CBA)

                  Respondent.
-------------------------------------------------------x
**AMON, United States District Judge:**

      Petitioner Thomas Fields, proceeding pro se, seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his state-court conviction of and sentence for two counts of predatory

sexual assault.  Fields asserts Miranda, due process, actual innocence, fair trial, and ineffective

assistance of counsel claims.  He also requests an evidentiary hearing.  For the reasons set forth

below, the petition is denied.

## BACKGROUND

### I.    Trial and Conviction[1]

      A New York state grand jury returned an indictment on September 2, 2009 charging that

on November 7, 2008, Fields had allegedly followed 18-year old Felicia Morales walking home

alone late at night.  He allegedly tackled her, then forcibly raped her twice behind a church.  Police

arrived in response to a series of 911 calls made in response to the woman's screams.  A chase

ensued, and the rapist escaped on foot.  The rapist left behind a distinctive jacket, which featured

an image of cartoon characters, a hat, and a shoe at the crime scene.  (D.E. # 18 ¶¶ 3, 5.)

---

[1]The following facts were adduced by the government at trial.  Fields maintains his innocence and so disputes
many of these facts.

The police investigated a number of leads in the following days but to no avail.  One lead was Andre Cash; he was suggested as a person of interest by Sergeant Debra Abbadessa of the Special Victims Unit.  Lead Detective Richard Ortiz drove to Albany, where Andre Cash lived. After speaking to Cash, his girlfriend, and the manager of the restaurant where Cash worked, Ortiz returned to Staten Island satisfied that Cash's alibi eliminated him as a suspect.  (Id. ¶ 31.)  Sergeant Abbadesa later testified that her belief that the victim had identified Cash as the perpetrator was mistaken.  (T. 822-84.[2])

On November 12, Detective Ortiz received an anonymous tip directing him to 140 Van Pelt Avenue, where Fields lived.  At that address, Ortiz met Joshua Williams—Fields's cousin— who matched the physical profile of the rapist.  Ortiz interviewed Williams at the precinct. Williams informed Ortiz that after midnight on November 7, Fields had left the house, was gone around 20 minutes, and returned home in a "beat up" condition and out of breath.  Fields was not wearing a jacket when he returned.  Williams informed police that Fields wore a similar jacket to that which the perpetrator had worn.  (D.E. # 18 ¶¶ 32-33.)

Ortiz returned to 140 Van Pelt Avenue, where he met Fields and brought him to the police station for questioning.  Ortiz told Fields that he had been speaking to Fields's cousin at the precinct and wanted "to clear up some stuff" the cousin had told Ortiz.  (T. 707:13-14.)  At the precinct, Ortiz put Fields into a separate room from Williams, but Fields knew that his cousin was being questioned elsewhere in the precinct.  Ortiz asked Fields where he was in the early morning hours of November 7.  Fields said he had gone to the store but was confronted by a group who he believed was setting him up for a robbery.  Fields said that one of the men began physically

---

[2] The trial transcript appears in docket entries 19-5 through 19-12.  For ease of reference, I cite to the transcript in the format (T. #:#), where the # symbol refers to page and line numbers.  All other citations to non-transcript docket entries cite to the page of the docket, not to internal pagination, unless a document includes numbered paragraphs.

assaulting him.  He stated that a woman also began attacking him, and Fields punched her in self-defense. He then ran because the police arrived.  (Id. at 706:20-709:17.)

Ortiz showed petitioner a photograph of the jacket that the police had recovered, and Fields said, "that's not my jacket."  At that point, Ortiz administered the Miranda warnings, and petitioner agreed to continue speaking to him.  Ortiz told him that the information he was supplying was inconsistent with the other information revealed by the investigation.  Petitioner said that he had spoken to "the girl" and that he knew her from the neighborhood.  Ortiz showed Fields a surveillance tape of Morales being attacked.  As it played, Fields commented on the section in which the perpetrator tackled Morales, stating that, "we always play fight like that.  We were just playing around."  When Ortiz asked Fields whether he had had sex with Felicia that night, Fields said that he had engaged in only oral sex with her.  Ortiz again asked Fields about the jacket and a shoe that was recovered at the crime scene, and Fields admitted that both were his.  Fields had injuries on his hands, which he said he sustained while running from the police on the night in question.  (Id. at 710:4-717:24.)

The next day, Ortiz conducted a lineup procedure for Morales to identify the perpetrator.  When the curtain was raised between the viewing room and the lineup, Morales began to cry, and pointed out Fields as her assailant.  (Id. at 718:15-722:18.)  DNA testing was performed on the hat and shoe recovered at the crime scene.  The hat—which Morales identified at trial as belonging to her assailant—tested positive for Fields's DNA.  The shoe did not test positive for any DNA.  The jacket recovered at the crime scene was not tested.  (Id. at 466:22-469:18, 475:13-477:3, 482:17-484:19.)

Fields moved to suppress the statements that he made to Detective Ortiz on the day he was arrested.  The Richmond County Supreme Court heard argument on the motion on September 2,

2009.  (D.E. # 19-1.)  By written decision dated October 1, 2009, Justice Rooney denied the motion in all respects.  The court rejected the argument that the statements Fields had made should be suppressed under <u>Miranda</u>; the court reasoned that the initial statements were non-custodial, and the subsequent statements followed properly administered <u>Miranda</u> warnings and were also voluntary in nature.  (D.E. # 19-3 at 6-7.)

On March 1, 2010, Fields proceeded to a jury trial in Richmond County Supreme Court. At trial, Morales again identified Fields as the man who raped her.  The state filed a Special Information which alleged that Fields had twice been previously convicted of Rape in the First Degree.  Out of the presence of the jury, Fields admitted that he had been so convicted.  (T. 533:5-11, 638-44.)

The jury returned a guilty verdict on both counts of Predatory Sexual Assault on March 15 and 16.  (<u>Id.</u> at 1026:6-25.)  On April 16, 2010, Fields was sentenced to two consecutive terms of imprisonment of twenty-five years to life.  (D.E. # 19-13 at 22:25-23:13.)

## II.    Direct Appeal

Fields appealed to the Appellate Division, Second Department.  In a counseled brief, he argued that (1) the verdict was against the weight of the evidence, (2) the evidence was legally insufficient to establish his identity as the perpetrator, and (3) his aggregate sentence was excessive and should be modified to have the terms run concurrently.  (D.E. # 19-14.)  In supplemental briefing that Fields filed <u>pro se</u>, he argued that (4) he was denied effective assistance of counsel in that counsel failed to move to dismiss the indictment as containing multiplicitous counts and failed to investigate a surveillance video, and (5) that he was actually innocent.  (D.E. # 19-18.)

On October 28, 2015, the Appellate Division affirmed the judgment of conviction.  The court found that "petitioner's contention that the evidence was legally insufficient to support his

conviction of two counts of predatory sexual assault . . . is unpreserved for appellate review."
(D.E. # 19-20 at 1.)  In any event, the court found that claim to be without merit, concluding that
Fields's guilt had been proven and the verdict was not against the weight of the evidence.  As to
the ineffective assistance of counsel claim, the appellate court found it to be unsupported by the
record; but as the claim involved matters outside the record, the court suggested that a C.P.L. §
440.10 proceeding would be the proper vehicle to review counsel's performance.  (Id. at 1-2.)  The
New York Court of Appeals denied leave to appeal on July 7, 2016.  (D.E. # 19-21.)

## III.    Post-Conviction Proceedings

On February 18, 2014, Fields filed a CPL § 440.10 post-conviction motion.[3]  The motion
claimed that Fields had been denied effective assistance of counsel.  Fields also claimed his
conviction was obtained through fraud; that material evidence adduced at trial was false; that
material evidence was procured in violation of his constitutional rights; that newly discovered
evidence supported vacatur; and that the judgment was obtained in violation of his constitutional
rights.  The claims centered on surveillance video taken from a store near the crime scene, which
was apparently provided to Fields by his appellate counsel.  Fields maintained that he was a man
seen in the video speaking to the perpetrator, rather than the perpetrator himself.  On this basis,
Fields claimed that (1) Detective Ortiz perjured himself when he stated that he had spoken to the
man in the video and that that man was not Fields; (2) the video constituted exculpatory material
which the prosecutor should have disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963);
(3) his attorney was ineffective for failing to make a specific demand to view the video upon

---

[3] Fields had earlier filed a § 440.10 motion on December 21, 2011, while his direct appeal was pending.  He later withdrew this motion on March 6, 2013.  In April 2012, Fields served on the Richmond County District Attorney's ("RCDA's") Office a § 440.10 motion, but did not file it with the court.  In July 2012, he informed the RCDA that he did not intend to file that § 440.10 motion.  (D.E. # 18 at 22.)

learning of it; (4) his attorney was ineffective for failing to investigate the contents of the video; and (5) had counsel investigated the video, he would have been able to properly cross-examine one of the state's witnesses, who was allegedly also seen on the video. Fields further alleged that his trial counsel had failed to call certain witnesses, introduce certain evidence, impeach the victim, and raise various arguments challenging the lineup identification. Finally, Fields contended that the prosecutor perpetrated a fraud on the court when she made statements regarding Andre Cash's whereabouts the night of the crime and the reasons he had been rejected by the police as a potential suspect. (D.E. # 19-22.) The Richmond County Supreme Court denied this § 440.10 motion on May 18, 2015. (D.E. # 19-24.)

On June 1, 2017, Fields filed another § 440.10 motion.[4] This time, he raised a claim of freestanding actual innocence on the ground that his conviction was obtained in violation of his constitutional right to due process of law, a claim based on the statements and testimony of Joshua Williams, as well as prosecutorial misconduct and ineffective assistance of counsel claims. The thrust of his arguments was that Joshua Williams was the true perpetrator, and that the testimony and evidence against Fields had been fabricated by the police, prosecutor, and/or Williams himself. Fields also sought additional DNA testing of the baseball hat pursuant to C.P.L. § 440.30(1-a). (D.E. # 19-28.) On October 17, 2017, the Richmond County Supreme Court denied the motion. (D.E. # 19-31.)

On April 27, 2018, Fields commenced the instant action. (D.E. # 1.) On May 26, 2020, he filed a proposed amended petition. (D.E. # 42.) The state responded that it did not oppose the filing of the amended petition, and rested on its opposition to the initial petition. (D.E. # 46.) On

---

[4] Fields had earlier filed another § 440.10 motion on January 27, 2017 which he withdrew on May 22, 2017. (D.E. # 18 at 5.)

September 8, 2020, the Honorable Roslynn Mauskopf granted Fields's request to file an amended petition. This case was reassigned to me on July 2, 2021.

## STANDARD OF REVIEW

A federal court may grant habeas relief to a state prisoner only for violations of federal law. 28 U.S.C. § 2254(a). As an initial, procedural prerequisite to attaining federal habeas relief, "a state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application." Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (citing 28 U.S.C. § 2254(b)(1)(A)). This means that, for federal habeas relief to be available, the prisoner must have "'present[ed] the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it' . . . 'in terms that are likely to alert the state courts to the claim's federal nature.'" Id. (first quoting Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005); and then quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

Where a state prisoner has exhausted all state remedies, a federal court may consider whether habeas relief is merited. A federal court may grant relief where a state court adjudicated the habeas petitioner's federal claim "on the merits" only where that adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). This standard is "difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Id. at 101 (internal quotation marks and citation omitted). What is reasonable disagreement "depend[s] in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway [state] courts

have in reaching outcomes in case-by-case determinations." Id. In essence, a court "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Burt v. Titlow, 571 U.S. 12, 20 (2013) (alteration and internal quotation marks omitted).

## DISCUSSION

Construing Fields's amended petition "liberally" and "reading [it] to raise the strongest arguments [it] suggest[s]," Fields raises six grounds in his petition. United States v. Pilcher, 950 F.3d 39, 44 (2d Cir. 2020) (quoting McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam)); see also Williams v. Kullman, 722 F.2d 1048, 1050 (2d Cir. 1983) ("[D]ue to the pro se petitioner's general lack of expertise, courts should review habeas petitions with a lenient eye, allowing borderline cases to proceed."). I address each in turn.

### I.   Miranda Violations

Fields first argues that his rights under Miranda v. Arizona, 384 U.S. 436 (1966), were violated through the introduction at trial of statements he made to Detective Ortiz on the date of his arrest. The state responds that this claim is procedurally barred because Fields failed to raise it in state appellate or post-conviction proceedings. The state also argues that the claim should be dismissed on the merits, because Fields has not shown that his Miranda rights were violated.

I first consider whether the claim is procedurally barred. The claim that introducing Fields's arrest-day statements to Detective Ortiz would violate Miranda was considered by the state court in a pre-trial hearing on September 2, 2009, (D.E. # 19-1), and denied on October 1, 2009, (D.E. # 19-3). Fields contends that he also raised this argument in a supplemental brief before the Appellate Division, and in his 2014 and 2017 § 440.10 submissions. (D.E. # 42 at 14.)

The state contends that his supplemental brief failed to place the Appellate Division on notice of this argument.  (D.E. # 18-1 at 2.)

The state does not deny that Fields argued in his supplemental brief that "[a]t no time did the appellant waive his right to [M]iranda," "at no time did Ortiz issue appellant Miranda [warnings]," and "Appellant did not waive his Miranda rights at anytime and was not informed of them by Ortiz." (D.E. # 19-18 at 40, 42.)  Instead, it argues that these statements were insufficient to put the Appellate Division on notice because they were "made in support of his claim that the verdict was against the weight of the evidence," and were not placed in a separate section specifically addressing the Miranda claim.  (D.E. # 18-1 at 2.)  But this argument places a heavier burden on Fields than the law requires.  A state court may be alerted to the federal nature of a claim through the state defendant's "reliance on pertinent federal cases employing constitutional analysis" or "state cases employing constitutional analysis in like fact situations," his "assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution," or his "allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Rosa, 396 F.3d at 217-18 (quoting Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 194 (2d Cir. 1982)).

Under this standard, Fields's supplemental brief was sufficient to put the Appellate Division on notice of his Miranda-based claims.  Fields expressly argued that his Fourteenth Amendment right had been violated.  (D.E. # 19-18 at 39.)  He cited numerous federal and state Miranda cases that discuss the legal considerations pertaining to his Miranda claim.  (Id. at 40-41, 45.)  He discussed a fact pattern in which he was brought to the precinct, "interrogat[ed]," and "not issued Miranda [warnings]," (id. at 39-40), that is "well within the mainstream of constitutional litigation" on Miranda claims, Rosa, 396 F.3d at 218 (quoting Daye, 696 F.2d at 194).  And

although "[p]resenting the essential factual and legal premises of a federal constitutional claim does not require that the petitioner 'cit[e] chapter and verse of the Constitution,'" id. at 217 (emphasis added) (quoting Daye, 696 F.2d at 194), Fields explicitly cites the Fifth Amendment and offers a page-long gloss on the Miranda decision itself, (D.E. # 19-18 at 41, 47-48).

Although exhausted, Fields's claim fails on the merits. Fields's argument that the introduction of his arrest-day statements violated his Miranda rights comes in two parts: first, he argues that he was in custody prior to the time when Detective Ortiz claims to have read him his Miranda rights; and second, that Detective Ortiz never read him those rights at any time. As to the custody question, according to the state, Fields came to the police station voluntarily that day; then, when he was placed under arrest later that night, Fields was read his Miranda warnings and orally agreed to waive his Miranda rights. In its decision on Fields's suppression motion, the trial court agreed with this account, finding that "defendant agreed to accompany Detective Ortiz to the precinct, . . . agreed to cooperate with him and answer questions," and "was not placed under arrest until after having made incriminating statements." (D.E. # 19-3 at 6.) Fields tells a different version of the story. He says that he "was handcuffed, arrested and taken into custody . . at 9:20pm." (D.E. # 42 at 8.) Fields also says that he did not orally waive his Miranda rights. If Fields were in custody when he first made incriminating statements and did not waive his Miranda rights, then the trial court should have granted the motion to suppress. See Berkemer v. McCarty, 468 U.S. 420, 434-35 (1984) (holding that statements made while "in custody" should not have been used against defendant who had not been read his Miranda rights).

The Supreme Court has instructed that "whether a suspect is 'in custody'" for Miranda purposes "is an objective inquiry." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011). A court must "'examine all of the circumstances surrounding the interrogation,' including any

circumstance that 'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'" Id. at 270-71 (quoting Stansbury v. California, 511 U.S. 318, 322, 325 (1994)).  Given those circumstances, the court must ask whether "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." Id. at 270 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  "The custody test is general," and so the state court deserves extra leeway in determining Fields's custody status. Yarborough, 541 U.S. at 665.

Fields fails to carry the heavy burden of showing that the state courts' determination that he was not in custody prior to his arrest was unreasonable.  Fields claims he was arrested at home such that he was in custody when he made certain statements to Detective Ortiz.  The record belies this argument.  At the suppression hearing, Detective Ortiz testified that he "asked [Fields] to come back to the precinct with me and [Fields] agreed."  (T. 28:17-19, 109:22-24.)  Detective Ortiz testified that Fields was not handcuffed and that Detective Ortiz sat in the back of the car with Fields as they were driven to the precinct.  (Id. at 110:9-16.)  Fields did not testify at the suppression hearing.

In his motion here, Fields identifies several pieces of evidence that he believes support his claim that he was, in fact, arrested at his house.  He submits affidavits from witnesses who say the police "came to lock up Thomas Fields." (D.E. # 42 at 78.)  He also submits reports from his state parole officer which indicate that the police came "to the residence to bring [Fields] to the [precinct] for possible arrest" and that Fields was "arrested by NYPD while parole officer was at residence." (Id. at 75.)

These pieces of evidence do not make the state courts' determination—that Fields came to the precinct voluntarily—unreasonable.  First, Fields's new evidence is not a part of the state

record.  Because "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," I cannot consider the new evidence.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).[5]  Second, although it is relevant to the legal determination of whether Fields was in custody, whether he was handcuffed and arrested or came to the precinct voluntarily is a determination of fact.  In habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Without the new affidavits, Fields certainly has not rebutted this presumption.  Even if Fields had presented the new evidence of an arrest at his residence, it would not have been unreasonable for the state courts to credit the previously uncontradicted testimony of Detective Ortiz at the suppression hearing over the new evidence.[6]

Fields also argues that he was in custody because Detective Ortiz did not "advise defendant that he was not in custody."  (D.E. # 42 at 10.)  Although the Supreme Court stated in Yarborough that failing to advise a defendant that he was free to leave "weigh[ed] in favor of the view that [the defendant] was in custody," it held that it was but one of many factors to be considered.  541 U.S. at 665; see id. at 666-69 (discussing other factors).  It is not dispositive of the custody question and is certainly not enough to overcome my deference to the state courts' merits adjudication.

---

[5] Fields argues that the evidence is "newly discovered," (D.E. # 42 at 9), potentially attempting to take advantage of § 2254(e)(2)(A)(ii), which allows for a federal evidentiary hearing where, among other things, "a factual predicate . . . could not have been previously discovered through the exercise of due diligence."  Supreme Court precedent indicates, however, that a § 2254(e)(2) hearing is not available in the § 2254(d)(1) context.  See Cullen, 563 U.S. at 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); id. at 207 (Sotomayor, J., dissenting) ("New evidence adduced at a federal evidentiary hearing is now irrelevant to determining whether a petitioner has satisfied § 2254(d)(1).").

[6] Even if I could consider the new evidence, it could not rebut the § 2254(e)(1) presumption.  The parole documents are equivocal, and the only one that is first-hand and that contains any detail refers to a "possible arrest"— suggesting that an arrest may not have occurred at the house.  (D.E. # 42 at 73.)  And the affidavits do not mention handcuffs or any manner of detail on the events at Fields's residence.  Their evidentiary value is far outweighed by the detailed, first-hand testimony at the suppression hearing.  They do not clearly and convincingly rebut the state court's findings.

Additionally, Fields contends that Detective Ortiz never issued any <u>Miranda</u> warnings whatsoever.  Again, the state courts' determination that Detective Ortiz gave the warnings is "presumed to be correct." 28 U.S.C. § 2254(e)(1).  Fields has offered no credible or persuasive— let alone clear and convincing—reason to doubt the testimony of Detective Ortiz that he administered <u>Miranda</u> warnings at the precinct later that night.

## II.    Alleged Misidentification by Morales

Fields also argues that Morales "not only misidentified [Fields] but that her out-of-court identification was subjected to suggestiveness and taint."[7]  (D.E. # 42 at 12.)  Taint by police conduct raises constitutional concerns: "[J]udged by the 'totality of the circumstances,' the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." <u>Foster v. California</u>, 394 U.S. 440, 442 (1969) (quoting <u>Stovall v. Denno</u>, 388 U.S. 293, 301-02 (1967)).  Questions related to the reliability of an identification unrelated to suggestiveness "present[] no due process obstacle to admissibility," <u>Brisco v. Ercole</u>, 565 F.3d 80, 88 (2d Cir. 2009), but "[a] federal habeas court may, of course, review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a 'fundamentally fair trial.'"  <u>Freeman v. Kadien</u>, 684 F.3d 30, 35 (2d Cir. 2012) (quoting <u>Zarvela v. Artuz</u>, 364 F.3d 415, 418 (2d Cir. 2004)).

In arguing that the identification was tainted, Fields points to Morales's awareness that "there was a 'suspect in custody'" and the other lineup members' differing heights and weights.  (D.E. # 42 at 14.)  He also conjectures, without support, that there was a second lineup.  On Morales's awareness that there was a suspect in custody, "neither [the Second Circuit] nor the

---

[7] Fields's argument to this effect falls within his Point I, discussing "Miranda Violation/Illegal and Unlawful Arrest 4th, 5th & 14th Amendment Violations."  (D.E. # 42 at 7.)  Construing the petition liberally, it appears that this argument is brought under the 14th Amendment alone and is not related to <u>Miranda</u>.

Supreme Court has ruled that such statements, by themselves, render a lineup impermissibly suggestive." Piper v. Portuondo, 82 F. App'x 51, 52 (2d Cir. 2003) (summary order). Fields's other complaints are directly contradicted by the trial court's findings at the suppression hearing that there was "no characteristic or visual clue that would have oriented the viewer toward the defendant as the perpetrator" and that the "conduct of the police throughout the procedure was neutral." (D.E. # 19-3 at 8.) Fields does not present evidence to overcome the presumption in favor of the state courts' factual findings. See 28 U.S.C. § 2254(e)(1).

The evidence does not bear out Fields's other arguments. Fields argues the lineup records contain no "indication of the petitioner being identified by Morales." (D.E. # 42 at 12.) Although the document to which Fields refers was apparently not signed by Morales, it otherwise indicates that she identified Fields and stated: "He's the one who raped me." (Id. at 90.) Detective Ortiz testified at the suppression hearing as to the procedures of the lineup and that Morales identified Fields as the rapist. (D.E. # 19-1 at 39:9-41:15.) Fields also cites testimony from trial in which Morales affirmed that during the rape she "did not get a good look at his face." (D.E. # 42 at 12 (quoting T. 553:6).) But Morales had elsewhere testified that she had "seen his face in the outside light." (D.E. # 19-8 at 507:8-10.)[8] She testified at trial to the fact that she identified Fields in the lineup, and then identified him again in the courtroom. (Id. at 518:20-519:13.) The evidence Fields identifies shows, at most, minor inconsistencies with the substantial evidence that Morales did identify him in the lineup procedure. None of these inconsistencies is enough to show that Fields's trial was not fundamentally fair.

---

[8] Fields notes that the record includes some inconsistent information concerning his height and weight: an initial arrest report stated (correctly, he contends) that he was 5'7" and 140 pounds, but the lineup report lists him as 5'10" and 190 pounds. (D.E. # 42 at 12-13.) This one inconsistency does not outweigh the plain testimony of Detective Ortiz and the victim that Fields was the individual who the victim identified in the lineup.

In sum, Fields has not proven that the state court's admission of Morales's identifications was constitutionally suspect.

## III.    Actual Innocence

Fields's next claims that he is actually innocent.  His central claim is that his cousin, Josh Williams, was the actual perpetrator.  He marshals several pieces of evidence in support of this claim.  The anonymous caller who tipped off Detective Ortiz as to whom the perpetrator might be said only that he lived at 140 Van Pelt; Williams lived there with Fields.  (D.E. # 42 at 16.) Williams admitted that he had interacted with the victim on the night of the crime, (id. at 19-21); and Williams matched an initial description of the perpetrator, (id. at 17).  Further, according to Fields, the DNA testing that supported his conviction could have been the DNA of Williams, due to the familial relation.[9]  (Id. at 36-37.)  The state contends that actual innocence does not provide a freestanding claim for habeas relief.  "That is because," the state says, "such a claim does not survive the jury's verdict to the contrary, based on the evidence at trial and the jury's finding of fact that guilt has been proved beyond a reasonable doubt."  (D.E. # 18-1 at 21 (first citing Herrera v. Collins, 506 U.S. 390 (1993); and then citing Townsend v. Sain, 372 U.S. 293 (1963)).)

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Herrera, 506 U.S. at 400.  Although the Supreme Court has not conclusively "resolved whether a prisoner may be entitled to habeas relief based on a

---

[9] Fields also makes more general objections to the DNA evidence, arguing that there were "discrepancies" in the lab testing that could have led to "contamination," (D.E. # 42 at 34); that, according to general expert publications, DNA testing often ends in contamination, (id. at 39); and that a New York Times article pointing to the contemporaneous mishandling of some DNA samples means his sample was mishandled, (id. at 40; D.E. # 42-1 at 5-7).  Fields's argument that there might have been contamination does not rise to the high evidentiary standard required for a freestanding actual innocence claim (should such a thing exist), see infra.  Neither do general citations to expert publications and a New York Times article—which he does not credibly or compellingly tie to the testing of DNA in this case.

freestanding claim of actual innocence," McQuiggin v. Perkins, 569 U.S. 383, 392 (2013), courts in the Second Circuit "have repeatedly held that a 'freestanding' claim of actual innocence . . . unaccompanied by an allegation of some constitutional error, does not provide a basis for habeas relief." Frias v. United States, Nos. 09-CV-2537 (JFK), 01-CR-307 (JFK), 2010 WL 3564866 at *6 (S.D.N.Y. Sept. 13, 2010).  If a freestanding actual innocence claim were to exist, the standard necessary to succeed on such a claim would be "extraordinarily high."  See House v. Bell, 547 U.S. 518, 555 (2006).   At a minimum, the petitioner would need to identify "credible and compelling" evidence that compelled the conclusion that no reasonable juror could have found the petitioner guilty beyond all reasonable doubt.  Rivas v. Fischer, 687 F.3d 514, 540-41 (2d Cir. 2012); Holder v. Lamanna, No. 18-cv-7431, 2020 WL 804902, at *13 (E.D.N.Y. Feb. 18, 2020).

Even if Fields could bring a freestanding claim of actual innocence, the facts he marshals would not rise to the extraordinarily high standard required to grant such a claim.[10]  Fields contends that his cousin, Joshua Williams, was the true perpetrator of the crime.  He identifies several reasons why Williams purportedly could have committed the crime.  But simply identifying the possibility of an alternate perpetrator does not provide the "clear and compelling" evidence necessary to support an actual innocence claim.  The sort of evidence that might support an actual innocence claim is, for example, new scientific expert testimony that provides the petitioner with an unassailable alibi. E.g., Rivas, 687 F.3d at 543-44.  Fields provides no compelling evidence that he did not commit the crime, and provides only weak evidence that another person could have. Moreover, the argument that Joshua Williams may have been the true perpetrator was made at

---

[10] The heading for this claim in the petition is "Actual Innocence – 8th & 14th Amendment Violations." (D.E. # 42 at 15.)  Nowhere in the briefing does Fields make constitutional arguments apart from his actual innocence argument that "Joshua Williams was the true perpetrator in this case." (Id.)  To the extent that Fields impliedly argues that his being imprisoned despite being actually innocent violates the Eighth and Fourteenth Amendments, he has failed to make the requisite showing for the reasons described above.

length by trial counsel.  (See T. 838:19-20, 839:9-10, 848:23-24, 861:14-18, 862:5-866:2, 870:20-883:19 ("Look no further than Joshua Williams if you're looking for reasonable doubt.").)  That argument to the jury was largely grounded in the same evidence on which Fields again relies here, which further undermines his claim of actual innocence.  Cf. Rivas, 687 F.3d at 543 ("What makes the claim 'credible,' as Schlup defines that term, is that it is based on new evidence—that is, evidence not heard by the jury . . . .").[11]

In sum, even if a freestanding claim of actual innocence were legally cognizable, Fields has not met the extraordinarily high standard necessary to prevail on such a claim.

## IV.   Prosecutorial Misconduct / 14th Amendment Violation

Fields argues that he is entitled to habeas relief because the prosecution failed to disclose certain information prior to trial, in violation of Brady.  "Under Brady, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment."  Smith v. Cain, 565 U.S. 73, 75 (2012).  Suppressed evidence is "material" under Brady "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," or in other words if the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Cone v. Bell, 556 U.S. 449, 469-70 (2009) (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

---

[11] Fields does cite post-trial evidence in the form of electronic messages from 2013.  He contends that these messages were exchanged between his brother and the victim's sister, and the victim's sister stated that she "just want[s] to let u and ur Sis know iam sorry it was My Sis fault I cant make [things] right but yall still My pplz."  (D.E. # 42 at 107.)  This statement does not provide credible and compelling evidence that Fields is actually innocent.  First, it is ambiguous: the speaker does not state why she is "sorry" or in what way "it" was her sister's "fault."  Second, even if the victim's sister did believe Fields to be innocent in 2013, that belated belief would need to be weighed against the more contemporaneous testimony of the victim.  In any case, this evidence was not before the state courts, and it is unclear how a hypothetical freestanding actual innocence claim would interact with the Supreme Court's holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 563 U.S. at 181.

Here, Fields contends that it was constitutional error for the prosecution not to produce to him a surveillance video from a convenience store nearby where the crime occurred.  (D.E. # 42 at 48.)  That video shows two men standing outside of the convenience store.  One is in the jacket allegedly worn by the perpetrator, and the other is wearing a striped shirt.  Detective Ortiz testified that, after viewing the video (but before a suspect had been identified in the investigation), he spoke to the man in the striped shirt on multiple occasions in search of leads.  (D.E. # 19-1 at 89:3-23.)  Fields claims that he is the man in the striped shirt, which proves that he was not the perpetrator in the jacket.  Further, he claims that Detective Ortiz perjured himself when he testified that he did not know this witness's name, because admitting that he knew it was Fields would have required the prosecution to produce the surveillance tape to Fields as exculpatory evidence.  (D.E. # 42 at 49-51.)  For its part, the state deems this issue "at most, an area of potential cross-examination of Ortiz on an entirely collateral point."  (D.E. # 18-1 at 21.)  The state court agreed, finding the video to be "of minimal probative value except that it does, in part, corroborate the victim's testimony."  (D.E. # 19-24 at 2.)

Having reviewed the video, I agree with the state courts' conclusion that the state not producing it to Fields before trial does not constitute a <u>Brady</u> violation.  The faces of the men standing outside of the convenience store cannot clearly be seen from the footage, which was captured by a camera located inside the store.  The video does appear to confirm the presence of someone wearing a distinctive yellow jacket and a second person wearing a striped shirt.  But it is not apparent how this video would be favorable to the defense.  Because of the inability to plainly identify the face of anyone in it, the video's evidentiary value is so marginal that it is not material—<u>i.e.</u>, it could not "reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."  Cone, 556 U.S. at 469-70.  At the very least, Fields has failed to prove

that the state courts' determination was "unreasonable."

## V.    Insufficiency of the Evidence

Fields claims that his Fourteenth Amendment rights were violated because the evidence

was legally insufficient to support his conviction.[12]   In bringing a sufficiency challenge, the

petitioner "bears a very heavy burden," Einaugler v. Supreme Court of N.Y., 109 F.3d 836, 840

(2d Cir. 1997) (quoting Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993)), and cannot succeed

unless "no rational trier of fact could have found proof of guilt beyond a reasonable doubt,"

Policano v. Herbert, 507 F.3d 111, 115-16 (2d Cir. 2007) (quoting Jackson v. Virginia, 443 U.S.

307, 324 (1979)).  In assessing whether the petitioner has carried this heavy burden, courts view

evidence "in the light most favorable to the prosecution." Coleman v. Johnson, 566 U.S. 650, 654

(2012).  When "faced with a record of historical facts that supports conflicting inferences, [a court]

must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved

any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443

U.S. at 326.  A state court's determination that a jury's finding was not "so insupportable as to fall

below the threshold of bare rationality" is "entitled to considerable deference under AEDPA, 28

U.S.C. § 2254(d)."  Coleman, 566 U.S. at 656.

As a threshold matter, the state correctly notes that this insufficiency claim was rejected by

the Appellate Division as having been unpreserved for appellate review under N.Y. Crim. Proc.

---

[12] The petition also states that the conviction was "against the weight of the evidence." (D.E. # 42 at 54.)
Courts distinguish claims regarding the weight of the evidence (which are state law claims not cognizable on federal
habeas review) from claims regarding the legal sufficiency of the evidence (which implicate the Fourteenth
Amendment and are cognizable).  See, e.g., Esguerra v. Cronin, No. 21-cv-449(BMC), 2021 WL 681076 at *4
(E.D.N.Y. Feb. 22, 2021).  The government does not raise this issue.  Considering Fields's pro se status, I construe
his claim as a cognizable insufficiency claim, rather than an incognizable weight-of-the-evidence claim.  I further note
that the Appellate Division found that Fields's conviction was not against the weight of the evidence.  (D.E. # 19-20.)

Law § 470.05(2).  (See D.E. # 19-20 at 1.)  A federal habeas court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  Cone, 556 U.S. at 465 (quoting Coleman, 501 U.S. at 729).  Fields's failure to comply with the state's procedural rule requiring preservation is such an independent and adequate state law ground for denying the claim.  See, e.g., Downs v. Lape, 657 F.3d 97, 105-06, 108 (2d Cir. 2011) (affirming denial of a habeas claim where state court had rejected argument as unpreserved under § 470.05(2)).  This claim is therefore procedurally defaulted, and is denied on that basis.[13]

Even if the claim were not procedurally defaulted, it would be denied on the merits.  Fields broadly challenges the credibility of (1) Police Officer Jesse D'Ambrosio, who responded at the crime scene and made an in-court identification of Fields, and (2) Detective Ortiz, the lead detective who testified extensively about the investigation at trial.  (See D.E. # 42 at 55-59.)  As to Officer D'Ambrosio, even if there were reason to doubt his in-court identification, the jury was presented with sufficient evidence to convict Fields—including the in-court and out-of-court identifications by the victim and the presence of Fields's DNA on evidence found at the scene.  As to Detective Ortiz, Fields claims that he falsely testified that, during the arrest-day questioning, (1) Fields waived his Miranda rights; (2) Fields claimed ownership of the clothing items and accessories recovered at the crime scene; and (3) Fields identified himself as the suspect seen on surveillance footage taken by a camera at the church where the victim was attacked.  (Id. at 58.)  But the jury heard Detective Ortiz's testimony in the courtroom.  The argument that Detective Ortiz had perjured himself in this regard was made at length to the jury, (T. 866:5-870:7), which

_____

[13] Although a procedural default may be excused where a petitioner demonstrates cause for the default and prejudice from not reaching the claim, see Harris v. Reed, 489 U.S. 255, 262 (1989), or that he is actually innocent, Fields has demonstrated none of those facts here.

impliedly rejected it through its verdict, see Jackson, 433 U.S. at 326.  Even if a jury doubted Detective Ortiz's credibility, the record contained significant amounts of evidence that could support Fields's conviction, including the testimony of the victim and the DNA evidence.

In sum, Fields has fallen far short of carrying the heavy burden to demonstrate that the state court was unreasonable when it determined that his conviction was not "so insupportable as to fall below the threshold of bare rationality."  Coleman, 566 U.S. at 656.  His insufficiency of the evidence claim would accordingly be denied on the merits, even if it were not also procedurally barred.

## VI.    Ineffective Assistance of Counsel

Finally, Fields claims that he was deprived of the effective assistance of counsel, in violation of his constitutional right to counsel.  The Sixth Amendment of the United States Constitution entitles criminal defendants to "reasonably effective assistance" of counsel—i.e., assistance which does not fall "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 687, 690 (1984).  "[T]o succeed on a claim that he has been denied constitutionally effective assistance of counsel, the defendant must show both (a) 'that counsel's representation fell below an objective standard of reasonableness' and (b) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. DiTomasso, 932 F.3d 58, 69 (2d Cir. 2019) (quoting Strickland, 466 U.S. at 688, 694).

If possible, courts should resolve a motion using only "Strickland's prejudice prong," the second element of the test.  Waiters v. Lee, 857 F.3d 466, 478 (2d Cir. 2017).  Because "[t]he object of an ineffectiveness claim is not to grade counsel's performance," "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course

21

should be followed." Strickland, 466 U.S. at 697.  In order to meet Strickland's prejudice prong, the petitioner must prove that, but for the alleged error, "the chance of an alternate result [would have been] 'substantial, not just conceivable,'" such that the error is "sufficient to undermine confidence in the outcome." Waiters, 857 F.3d at 480 (internal quotation marks omitted) (first quoting Cullen, 563 U.S. at 189; and then quoting Strickland, 466 U.S. at 694).  As such, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696.

Fields raises several ways in which his trial counsel allegedly "fail[ed] to investigate key evidence for the defense that was in his possession." (D.E. # 42 at 61.)  I address each in turn.

**1.  Store Surveillance Video**

Fields first argues that his counsel was deficient for failing to request and investigate the surveillance footage discussed above.  The state courts rejected this claim for two reasons: (1) Fields had not adduced evidence that his trial counsel, in fact, failed to request or investigate this video, and (2) even if the video had not been obtained by defense counsel, it was "of minimal probative value except that it does, in part, corroborate the victim's testimony." (D.E. # 19-24 at 1-2.)  After reviewing the record, I agree with the state courts' conclusion.  The evidence that trial counsel failed to obtain the video is equivocal: he stated in a letter to Fields that "I simply don't remember" whether the video was provided to him by the state in discovery. (D.E. # 19-25 at 91.)  As to his failure to introduce the video at trial, for the reasons discussed above, the video is of little probative value. See supra Part IV.  Fields has not demonstrated that the chance of an alternate result would have been substantial had the video been introduced.  So even if he could meet the "performance" prong of Strickland, he would be unable to meet the "prejudice" prong.

### 2.  Diagram Drawn by Joshua Williams

Joshua Williams—Fields's cousin, who Fields contends was the true perpetrator—apparently drew a diagram of the crime scene when he was being interviewed by NYPD on November 12, 2009.  (D.E. # 19-25 at 41.)  Fields contends that it was prejudicial error for his counsel not to introduce this diagram at trial, because it purportedly shows that Williams knew "the exact location as to where incident took place at the scene."  (D.E. # 42 at 21.)  But this argument is unavailing.  The diagram Fields references is a crude sketch of the area in which the crime occurred.  It indicates, at most, that Williams visited the scene on the evening of the crime.  But this information was already conveyed to the jury.  Williams testified that after Fields returned home on the night of the crime in a "beat up" condition and out of breath, Williams went to the vicinity of the crime to find out "who put their hands on my cousin."  (T. 590:3-5, 592:18-21.)  Had the diagram been introduced at trial, it would at most have corroborated this testimony that the jury already heard.  Fields has not established that there was a substantial chance that the introduction of the diagram would have led to a different outcome at trial, and so this claim fails under Strickland.

### 3.  Photo Array Including a Photo of Williams

Fields claims that his counsel failed to pursue a "photo array which included a photo [of] Williams[,] which Ortiz denied existed."  (D.E. # 42 at 61.)  The argument appears to be that the police failed to show Morales a photo array including Williams, which would have permitted her to identify him as the true perpetrator.  Fields appears to suggest that such a photo array may have been created (but not shown) to Morales.  Detective Ortiz testified that he did not put Williams in any photo array, (D.E. # 19-11 at 761:7-8), and Fields provides no credible or convincing evidence to dispute that testimony.  Counsel's alleged failure to pursue a questionably existent photo array

is not "sufficient to undermine confidence" in the jury's verdict.  Strickland, 466 U.S. at 694.

Although the police's decision not to do more to affirmatively eliminate Williams as a suspect may

have been an area that Fields's trial counsel could have explored, trial counsel argued at length to

the jury that Williams was the true perpetrator.  The jury nonetheless convicted Fields, relying on

the substantial physical and testimonial evidence indicating his identity as the perpetrator.  Fields

has not shown a substantial chance that had counsel developed the point that Morales was not

given the opportunity to identify Williams the outcome of the trial would have been different.[14]

### 4.  Ortiz's Memobook

Fields submits a copy of notes taken by Detective Ortiz during his initial interview of

Fields, and contends that this "would have impeached Ortiz's claim that the defendant made self-

incriminating statements to him."  (D.E. # 42 at 61.)  The notes at issue document Fields informing

Detective Ortiz that:

> [T]heres [sic] a war going on between bloods gang members.  [Fields] was
> coming out of the store and was confronted by a mob of gang members by
> Hess station[.]  [H]e was with his cousin A.J.  [E]veryone started fighting
> [and] the girl got punched in the face.

(Id. at 88.)  The substance of this statement by Fields was elicited at trial, when Ortiz testified as

to what Fields told him during their initial interview.  (T. 708:14-709:17.)  Introducing this same

statement via written evidence, rather than through Detective Ortiz's testimony, would not have

substantially changed the likelihood of an alternate result at trial.  The best argument that Fields

might make as to this notebook page is that it contains only Fields's exonerating statements, but

not his incriminating ones; therefore, counsel might have argued, Detective Ortiz subsequently

fabricated those incriminating statements, because there is no contemporaneous record of them.

---

[14] I also note that trial counsel inquired of Ortiz about the fact that Williams was not put in a photo array or a lineup on cross-examination.  (T. 761:7-10.)

Given the significant other evidence that could support Fields's conviction, including the testimony of the victim and the DNA evidence, however, this additional argument likely would not have changed the outcome at trial.  See Strickland, 466 U.S. at 696.

### 5.  DNA Testing by an Independent Laboratory

Fields argues that counsel should have conducted independent DNA testing and hired a DNA expert.  As discussed above, Fields has adduced no particularly credible or compelling evidence indicating that there was any error in the DNA testing conducted by the government.  See supra Part III.  It is unclear that independent DNA testing would have uncovered anything, let alone substantially probable that it would have uncovered something sufficient to overcome the victim's in-court and out-of-court identifications.  See Velazquez v. Poole, 614 F. Supp. 2d 284, 343 (E.D.N.Y. 2007) ("[I]n the face of the identification evidence and without any indication as to what independent analysis [of DNA evidence] would have revealed . . . petitioner has failed to establish prejudice sufficient to merit habeas relief.").

Fields's argument that a DNA expert could have testified about the likelihood that Williams's DNA could have been mistaken for Fields's DNA, as they share the same paternal line, is entirely speculative.  The entire argument is based on one sentence from a textbook, taken out of context, and is not applied to the specific method by which Fields's DNA was actually tested. (D.E. # 42-1 at 67.)  Such an argument is directly contradicted by the only evidence in the record: the state's expert testified that the tested DNA was Fields's "within a reasonable degree of scientific certainty" and that it was so rare that it was "one in greater than one trillion," odds which would preclude confusion with the DNA of Fields's paternal family.  (T. 476:24-477:15.)

### 6.  Other Witnesses

Fields argues that counsel should have called various witnesses.  As other courts have recognized, this is a difficult ground on which to base a habeas claim: "[C]omplaints of uncalled witnesses are not favored in federal habeas review, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  Wood v. Artus, No. 15-CV-4602 (SJF), 2020 WL 3256848, at *9 (E.D.N.Y. June 15, 2020) (quoting Hodges v. Bezio, No. 09-CV-3402 (ENV), 2012 WL 607659, at *10 (E.D.N.Y. Feb. 24, 2012)).

First, Fields references "alibi" witnesses.  He apparently means those witnesses who allegedly saw police arrest him in front of his residence at 9:20pm, as pertinent to his Miranda arguments, rather than witnesses who could actually provide an alibi proving that he was not the perpetrator.  (See D.E. # 42 at 9 ("Trial counsel errored in not investigating alibi witnesses submitted to him by the petitioner who witnessed Ortiz with several law enforcement handcuff and take the petitioner into custody at 9:20pm on November 12, 2008.").)  This group appears to include Fields's parole officer.  As the state points out, an ineffective assistance claim related to the parole officer was never made in state court.  It is therefore procedurally barred.  See Jackson, 763 F.3d at 133.  As to the other "alibi" witnesses, it is not clear from the affidavits of those witnesses that they would have been helpful to Fields's Miranda claims, see supra Part I, and not clear, given the other evidence at trial, that the jury's verdict would have changed even had Fields's Miranda claims been successful.

It is also possible that Fields is referring to Tyshon Sanders as an uncalled alibi witness. Although Sanders is not referenced in the habeas petition, Fields cited an affidavit by Sanders in his 2014 § 440.10 Motion, in which Sanders affirmed that Williams, not Fields, was the one

wearing the cartoon jacket.  (D.E. #19-22 at 61.)  As the state properly points out, however, the jury may have doubted the testimony of Sanders, an imprisoned individual who in the same affidavit admitted to assaulting and robbing Fields.  Even if a jury found Sanders credible, Sanders's testimony does nothing to refute Fields's incriminating statements, the DNA evidence, or Morales's identifications.

Second, Fields argues that counsel should have called Gary VanManen, who could have testified that he saw the perpetrator wearing a do-rag, not a hat.  (See D.E. # 42 at 43.)  But that one witness saw the perpetrator without a hat at a certain time may have done little for the defense's case—as the state points out, "hats are readily removed and replaced."  (D.E. # 18-1 at 38.)

Third, Fields argues that counsel should have called Andre Cash, who at one time was a suspect and who Fields alleges was a potential perpetrator.  Fields does not explain what he hopes Cash would have testified to.  Especially given the ADA's investigation in which "he was satisfied that Andre Cash was in Albany at the time of the crime," (D.E. # 19-24 at 2), there is little reason to believe that Cash was the perpetrator, let alone that he would admit as much on the stand.

Fourth, Fields argues that counsel should have called the store clerk.  He does not explain what testimony the store clerk might have had or how it would have been helpful to him.  This claim fails to satisfy Strickland's prejudice prong.

### 7.  **Independent Investigation of the Crime Scene**

Finally, Fields argues that his counsel erred by failing to "[c]onduct his own investigation of the crime scene."  (D.E. # 42 at 62.)  He does not indicate what he believes counsel would have discovered had he investigated the crime scene himself, or even provide proof that counsel did not undertake his own investigation.  It is not obvious how the major evidence rallied against Fields, including the identifications, the DNA evidence, and Fields's own incriminating statements, would

be undermined by a post-incident investigation of the crime scene itself.  The basic assertion that counsel should have done more investigating, without indication of what that investigation might have turned up, is not enough to satisfy <u>Strickland</u>'s prejudice prong.

In sum, Fields has failed to prove that his counsel was ineffective or that any error on his counsel's part meets <u>Strickland</u>'s high standard of prejudice.

## VII.    Request for an Evidentiary Hearing

Finally, Fields requests an "evidentiary hearing to fuller develop[] the facts of this case or any relief that the court deems just and proper."  (D.E. # 42 at 63.)  He cites to a list of "six situations in which state errors require the federal court to hold an evidentiary hearing."  (<u>Id.</u>)  This list appears to come from the Supreme Court's opinion in <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963).  <u>Townsend</u>'s evidentiary hearing standard was later modified by <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992), and eventually superseded by statute by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), <u>see</u> <u>Williams v. Taylor</u>, 529 U.S. 420, 434 (2000).  As the Supreme Court recognized in <u>Cullen</u>, "[a]s amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  563 U.S. at 181.  One such limitation is that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Id.</u> As such, whereas here Fields's claims that were not procedurally barred were adjudicated on the merits, an evidentiary hearing is inappropriate.  <u>See</u> <u>Jackson</u>, 763 F.3d at 152 (holding it error for the district court to have granted an evidentiary hearing).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.  Because Fields has not made a substantial showing of the denial of a constitutional right, a certificate of

appealability will not issue.  <u>See</u> 28 U.S.C. § 2253.  The Clerk of Court is respectfully directed to

enter judgment accordingly and close the case.

SO ORDERED.

Dated: August 24, 2021
       Brooklyn, New York

       <u>    /s/ Carol Bagley Amon      </u>
       Carol Bagley Amon
       United States District Judge